UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10183-GAO

UNITED STATES OF AMERICA,

v.

JUSTIN GREEN,
Defendant.

OPINION AND ORDER
January 11, 2010

O'TOOLE, D.J.

The defendant, Justin Green, is charged with conspiracy to possess oxycodone with intent to distribute and to distribute in violation of 21 U.S.C. § 846. Before the Court are three motions to suppress brought by the defendant. By the first, Green seeks to suppress statements made to Drug Enforcement Agency ("DEA") agents when he was arrested, and by the second and third, he seeks to suppress the seizure and search of two cellular telephones and all evidence derived therefrom.

## I. Summary of Facts

The following facts are taken from the parties' submissions:

The investigation by agents of the DEA that led to the present indictment began in December 2008 when a cooperating witness provided information about and recorded phone conversations with another defendant in this case, Gilberto Aguiar. The cooperating witness also purchased oxycodone pills from Aguiar that month and again in February 2009. Based on this information, the DEA obtained authorization to intercept calls on four telephones used by Aguiar and two other defendants, Dimas Almeida and Aaron Tripp.

On May 1, 2009, DEA agents intercepted a call from another defendant, Mark Carrolton, to Tripp's phone. During the call, the two men arranged for Tripp to travel to Florida to purchase a large quantity of oxycodone. Tripp agreed to bring approximately $320,000 to buy about 30,000 30mg oxycodone pills and 2,500 80mg oxycodone pills, most of which would be furnished by two suppliers, including one identified by Carrolton as "Justin" or "Jay." The government asserts that the Justin/Jay to whom Carrolton referred is the defendant, Justin Green.

On May 6, 2009, while en route to Florida, Tripp was pulled over by a South Carolina State Trooper. Tripp consented to a search of his vehicle, and the trooper found approximately $396,000 in United States currency in the car. Tripp subsequently agreed to cooperate with the DEA investigation. Under agents' supervision, he contacted Carrolton several times by phone to finalize details of a meeting scheduled for the next day at a Holiday Inn Express in Ft. Lauderdale, Florida.

On May 7, 2009, Carrolton and Green arrived at the Holiday Inn Express in separate cars. The car in which Green arrived was being driven by another person, who dropped Green off in the parking lot and left. Carrolton brought a knapsack, while Green was not observed to be carrying anything. The two men went to Tripp's hotel room and knocked on the door, but instead of Tripp, a DEA agent, Carl Rideout, answered the knock. Carrolton and Green attempted to flee down the hallway, but were apprehended. Carrolton's knapsack was subsequently searched; the police found several hundred 30mg and 80mg oxycodone pills inside. Two cellular phones, a Metro PCS Samsung and a Blackberry device, were seized from Green in a search of his person incident to his arrest. Carrolton and Green were transported to the DEA's Fort Lauderdale office.

Green asked to speak to an attorney. According to the DEA-6 documenting the incident, "[a]n interview of GREENE [sic] was attempted however GREENE requested to speak to his

2

lawyer prior to making statements. SA Carl Rideout inquired about GREENE'S employment history and GREENE replied he was unemployed . . . ." (Aff. in Supp. of Supplemental Mot. to Suppress Cellular Telephones Seized from the Def. and All Evidence Derived Therefrom Based upon Newly Learned Facts ¶ 9 (quoting DEA-6).)

At the station, the officers seized Green's jewelry, including his watch, necklace, and bracelet "as suspected proceeds derived from his Oxycontin and Oxycodone distribution activities." (Id. (quoting DEA-6).) Green then "stated the watch was a gift from a co-worker while he was working as a stock broker," but "was unable to provide information detailing his employer, dates he worked and income amounts." (Mot. to Suppress Statements ¶ 9 (quoting DEA-6).)

Both Green and Carrolton were released from custody without being charged.

On May 21, several weeks after the arrests, Agent Rideout, by then back in Massachusetts, removed the battery from each cell phone and obtained and recorded the phones' International Mobile Subscriber Identifier ("IMSI") numbers, unique identifying numbers assigned to the computer chips installed on cellular phones. On the Metro PCS, the IMSI number was visible on the telephone after the battery was removed. The Blackberry's IMSI was on a card inserted into the slot where the battery had been. Subsequently, the IMSI numbers were used to obtain toll and subscriber information associated with them.

## II. Conclusions of Law

### A. Statements Regarding Employment and Source of Jewelry

Green seeks suppression of his statement that he was unemployed and his statements concerning the source(s) of the jewelry that was seized during his detention at the station.

Questions about employment status are ordinarily regarded as "routine booking questions" and within an exception to the Miranda rule. See United States v. Duarte, 160 F.3d 80, 81 (1st Cir. 1998) (citing Pennsylvania v. Muniz, 496 U.S. 582, 600-602 (1990)). Unless there are circumstances indicating that such questions were pressed in an atmosphere that was unusually coercive so that the answers should be regarded as having been involuntary and compelled, there is no Fifth Amendment transgression. See id. There is no indication of any such coercion or pressure exerted by agents with respect to the question to Green about his employment status. It is true that the question was asked after he had requested to talk to a lawyer, but if a non-coercive routine booking question can be asked without implicating the Miranda rule, that should not matter.

Green's statements about his jewelry were either made spontaneously or were a kind of rejoinder by him to a statement—not a question—by an agent that the jewelry was being seized as proceeds of illegal drug trafficking. There was no actual interrogation. Nor was the agent's statement the functional equivalent of a question that begged answering. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980); United States v. Taylor, 985 F.2d 3, 8 (1st Cir. 1993).

The motion to suppress the statements is DENIED.

B. Cellular Phones

Green also seeks to suppress the cellular phones seized from him at the time of his arrest and all evidence derived therefrom. He contends that the seizure was unlawful, as were the subsequent searches.

*1. Seizure of Cell Phones*

Green first argues that the warrantless seizure of the cellular phones was improper and not authorized within the scope of any recognized exception. In particular, he argues that the seizure was not incident to a lawful arrest because the DEA lacked probable cause to arrest him.

Probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Burhoe, 409 F.3d 5, 10 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)). Here, the decision to arrest Green was supported by the intercepted phone call between Tripp and Carrolton in which the plans were discussed, the seizure of almost $400,000 from Tripp's car, the recorded telephone calls between Tripp and Carrolton after Tripp began cooperating, the arrival by Green and Carrolton at the pre-arranged meeting place and time, and their subsequent flight when the DEA agent identified himself at the door. Thus, under the totality of the circumstances, it was reasonable for the officers to conclude that a crime had been or was about to be committed by Green (and Carrolton). See Burhoe, 409 F.3d at 10. Because Green's arrest was based on probable cause, the contemporaneous seizure of his cellular phones was also lawful.

*2. Search of Cell Phones*

Green next argues that even if the seizure of the cell phones were justified, the opening of the phones and the removal of the batteries to acquire the IMSI numbers weeks later amounted to a "search" for which a warrant was required.

Here, the intrusion caused by the inspection was minimal. It is important to note that the agent did not turn the phones on, nor did he access the data stored in the phones, such as address books, text message histories, photographs, or emails. Compare, e.g., United States v. Zavala,

541 F.3d 562, 577 (5th Cir. 2008) (stating that a defendant has a reasonable expectation of privacy in the "wealth of private information" within a cell phone, including emails, text messages, call histories, address books, and subscriber numbers); United States v. Quintana, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) (cell phone owner has reasonable expectation of privacy in electronic data stored on phone). The only information gleaned from the searches was the IMSI numbers for each phone. They are akin to serial numbers. See United States v. Jadlowe, -- F.3d --, 2010 WL 4962855, at *8 n.23 (1st Cir. Dec. 3, 2010). They are unique to a particular phone and serve to identify it.

There is nothing wrong with an agent's examining an item lawfully seized to determine its particular identifying number. It is accepted that the police may ask a person his name. See Hiibel v. Sixth Jud. Dist. Ct. of Nev., 542 U.S. 177, 185 (2004) ("Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); Florida v. Bostick, 501 U.S. 429, 434-35 (1991) ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification . . . .") (internal citations omitted); Young, 105 F.3d at 6 ("Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment"). Similarly, they may make a cognate inquiry of an inanimate object. It is not significant that some manipulation of the device was necessary to get to the identifying number, just as a wallet or purse lawfully in police possession might legitimately be opened to see if there is identifying information within. These circumstances are different from those in Arizona v. Hicks, 480 U.S. 321 (1987), where the items examined for their serial numbers were not lawfully seized prior to the inspection.

6

Consequently, I find that Green did not have a reasonable expectation of privacy in the ISMI numbers associated with his cellular phones. The government action did not amount to a search to which the Fourth Amendment applies.

### III. Conclusion

For the foregoing reasons, the defendant's Motion to Suppress Statements (dkt. no. 85), Motion to Suppress Cellular Telephones Seized from the Defendant and All Evidence Derived Therefrom (dkt. no. 86), and Supplemental Motion to Suppress Cellular Telephones Seized from the Defendant and Cell Evidence Derived Therefrom Based Upon Newly Learned Facts (dkt. no. 104) are all DENIED.

It is SO ORDERED.

                                                        /s/ George A. O'Toole, Jr.
                                                    United States District Judge